**UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

FILED BY_____AP_____D.C.

Jun 4, 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

June 04, 2021

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  19-13694-HH
Case Style: Eddie Sierra v. City of Hallandale Beach
District Court Docket No: 1:17-cv-24045-FAM

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion was previously provided on the date of issuance.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to:  Lois Tunstall
Phone #:  (404) 335-6191

Enclosure(s)

MDT-1 Letter Issuing Mandate

# UNITED STATES COURT OF APPEALS
### For the Eleventh Circuit

_____

No. 19-13694

_____

District Court Docket No.
1:17-cv-24045-FAM

MR. EDDIE I. SIERRA,

Plaintiff - Appellant,

versus

CITY OF HALLANDALE BEACH, FLORIDA,

Defendant - Appellee.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued on this date in this appeal is
entered as the judgment of this Court.

Entered: May 06, 2021
For the Court: DAVID J. SMITH, Clerk of Court
By: Jeff R. Patch

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13694

_____

D.C. Docket No. 1:17-cv-24045-FAM

MR. EDDIE I. SIERRA,

Plaintiff - Appellant,

versus

CITY OF HALLANDALE BEACH, FLORIDA,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 6, 2021)

Before WILSON, NEWSOM, and ED CARNES, Circuit Judges.

WILSON, Circuit Judge:

Eddie Sierra appeals the district court's dismissal, for lack of standing, of his

claims against the City of Hallandale Beach (Hallandale Beach or the City) under

Title II of the Americans with Disabilities Act (ADA) of 1990, 42 U.S.C. §§ 12131–12134, and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

After review and with the benefit of oral argument, we conclude that the district court erred (1) in relying on the test articulated in *Price v. City of Ocala*, 375 F. Supp. 3d 1264 (M.D. Fla. 2019), to determine if Sierra suffered an injury in fact; and (2) in finding that Sierra did not have standing.  Accordingly, we reverse and remand for further proceedings.

## I.

Eddie Sierra is a deaf individual who lives and works in South Florida.  He is active in local government and various community organizations.[1]  Because of these engagements, Sierra keeps apprised of the current policies and procedures of local governments in South Florida.

Sierra visited Hallandale Beach's website, www.hallandalebeachfl.gov, in 2017.  He watched videos posted on the website, but some of the videos did not contain closed captions.  Sierra was unable to comprehend the aurally delivered information in those videos.  Thus, in July 2017, he emailed Joy Cooper, then-Mayor of Hallandale Beach, notifying her that he was deaf and that he could not understand some of the videos on the City's website.  He requested that the videos

---

[1] Sierra is the President and Director of the not-for-profit organization South Florida Seniors in Action and is a certified Medicaid planner and community presenter.  He also sits on committees in Miami-Dade County that are focused on serving people who have disabilities.

include captions, explaining that this was the best auxiliary aid available to him under the ADA.  Sierra also asked that if the Mayor was the wrong person to contact regarding this issue that she provide the identity of the correct person to contact.  The Mayor never responded to this email, so in September 2017, Sierra's attorney mailed a letter and a copy of the email to the Mayor's office via the United States Postal Service.  Neither the Mayor nor any official from Hallandale Beach ever answered Sierra's request.

After Hallandale Beach ignored Sierra's requests, he filed a complaint in the United States District Court for the Southern District of Florida, alleging violations of Title II of the ADA and section 504 of the Rehabilitation Act.  Initially, Sierra sought an injunction and compensatory damages.  Hallandale Beach filed a motion to dismiss for failure to exhaust administrative remedies.  The district court granted the motion, but we vacated the district court's decision on appeal.  *Sierra v. City of Hallandale Beach*, 904 F.3d 1343, 1353 (11th Cir. 2018).

In April 2019, Hallandale Beach passed a resolution to remove non-captioned videos from its website.  Subsequently, the parties filed cross-motions for summary judgment.  Hallandale Beach primarily claimed that Sierra lacked standing and that his claims were moot.  Sierra then sought only compensatory damages, refuted Hallandale Beach's motion, and moved for partial summary judgment, claiming he was discriminated against as a matter of law.

The district court dismissed the case for lack of standing because Sierra failed to demonstrate an injury in fact.  In reaching this conclusion, the district court relied on *Price*, a district court case concerning a blind plaintiff's ADA claim for injunctive relief.  375 F. Supp. 3d at 1267.  In dicta, the district court stated that even if Sierra had standing, he could not succeed on his claim, and that Sierra failed to provide sufficient evidence to demonstrate that Hallandale Beach acted with discriminatory intent; the City was merely negligent.

Sierra appeals the district court's order.  He argues (1) that the district court applied an improper test in determining he did not suffer an injury in fact; (2) that he did suffer an injury in fact and thus has standing; and (3) that there is a genuine dispute of material fact as to whether Hallandale Beach intentionally discriminated against him.

## II.

We review de novo a district court's dismissal of a case for lack of standing. *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1268 (11th Cir. 2006).

## III.

### A.

Before reaching the merits of any case we are obligated to determine if we have jurisdiction to consider the matter. *Trichell v. Midland Credit Mgmt., Inc.*,

964 F.3d 990, 996 (11th Cir. 2020).  Article III of the Constitution establishes that

federal courts only have jurisdiction over "Cases" and "Controversies."  U.S.

Const. art. III, § 2.  Standing doctrine falls within this constitutional requirement.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  We look to three

elements to determine whether a plaintiff has standing to sue: (1) injury in fact, (2)

causation, and (3) redressability.  *Id.*  The primary issue on this appeal is whether

the first element, injury in fact, is met.  To establish an injury in fact, the plaintiff

must demonstrate that he suffered "an invasion of a legally protected interest

which is (a) concrete and particularized; and (b) actual or imminent, not

conjectural or hypothetical."  *Id.* at 560 (internal quotation marks and citations

omitted).

First, there must be a concrete and particularized injury.  *Id.*  An injury is

particularized when it "affect[s] the plaintiff in a personal and individual way."  *Id.*

at 560 n.1.  To be concrete, the injury must be "real, and not abstract."  *Spokeo,*

*Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (internal quotation marks omitted).

The term concrete, however, is not necessarily synonymous with the word

tangible—intangible injuries can be concrete.  *Id.* at 1549.

Second, the harm must be actual *or* imminent.  *Lujan*, 504 U.S. at 560.  Our

analysis here often depends on the type of relief the plaintiff seeks.  *A&M Gerber*

*Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1210–11 (11th Cir.

2019); *see also Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1328 (11th Cir. 2013) ("The 'injury-in-fact' demanded by Article III requires an additional showing when injunctive relief is sought."). When the plaintiff seeks damages, we consider whether an alleged *past* harm occurred. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (explaining that plaintiff must show past harm to recover in an action for damages). On the other hand, when the plaintiff is seeking an injunction, we determine whether he or she adequately demonstrates that a *future* injury is imminent—that there is "a sufficient likelihood that he [or she] will be affected by the allegedly unlawful conduct in the future." *Koziara v. City of Casselberry*, 392 F.3d 1302, 1305 (11th Cir. 2004); *see also id.* at 1306 (finding that because the plaintiff sought declaratory and injunctive relief the injury analysis "is concerned with future harm, not past harm"); *Houston*, 733 F.3d at 1328.

An individual who suffers an intangible injury from discrimination can establish standing if he personally experienced the discrimination. *See Allen v. Wright*, 468 U.S. 737, 757 n.22 (1984); *Aaron Priv. Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1338 (11th Cir. 2019). "[D]iscrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' . . . can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Heckler v. Mathews*, 465 U.S. 728, 739–40

6

(1984).  We call this "stigmatic injury."  *Allen*, 468 U.S. at 757 n.22.  In order to

sufficiently allege stigmatic injury, a plaintiff still must meet the constitutional

standing requirements.  *See id.* (explaining that plaintiffs alleging stigmatic injury

must have personally experienced the discrimination and must satisfy the causation

and redressability requirements to have standing); *see also Berry*, 912 F.3d at 1338

(finding that an organizational plaintiff that alleged stigmatic injury did not have

standing because it did not adequately allege "it [was] among the class of persons

whose concrete interests [were] affected by discriminatory treatment").

## B.

The district court erred in relying on the Middle District of Florida's

decision in *Price v. City of Ocala* to analyze whether Sierra suffered an injury in

fact.  Since *Price* is a district court opinion, it does not constitute binding

precedent.  Even if we were bound by it, *Price* is unhelpful here because it is

fundamentally different from this case.  In *Price*, a blind individual sued the City

of Ocala seeking an injunction under Title II because certain documents on Ocala's

website were not accessible to visually impaired individuals.  375 F. Supp. 3d at

1267.  The court considered three nonexclusive factors to decide whether the

plaintiff was likely to suffer a future injury.[2]  *Id.* at 1274–75.  While the underlying

---

[2] Specifically, the court considered: "(1) [the] plaintiff's connection with the defendant
governmental entity; (2) the type of information [on the website] that is inaccessible; and (3) the

facts in *Price* are similar to the case at hand, the cases differ in a significant

respect: the remedy sought for the alleged ADA violation.  The *Price* factors were

used to consider claims for injunctive relief.  They are not instructive in this case.

Here, Sierra is now seeking only compensatory damages.  Accordingly, we must

assess Sierra's *past* harm.

## C.

Sierra has standing to bring his claim under Title II, as he adequately alleged

a stigmatic injury.[3]  Sierra, as an individual with a disability, has a concrete interest

in equal treatment under the ADA and the Rehabilitation Act.  42 U.S.C. § 12132;

29 U.S.C. § 794.  His injury is undoubtedly related to Hallandale Beach's alleged

misconduct: publishing videos on its website that were inaccessible to deaf

individuals and then failing to provide requested accommodations.  That is, Sierra

was personally and directly subjected to discriminatory treatment when Hallandale

---

relation between the inaccessibility and [the] plaintiff's alleged future harm." *Price*, 375 F.
Supp. 3d at 1275.

[3] While Sierra alleges that he is not a tester plaintiff, even if he were, we would still likely find
that he has standing.  In *Houston*, we found that the plaintiff's "status as a tester [did] not deprive
him of standing to maintain his civil action" under Title III of the ADA.  733 F.3d at 1332.  We
pointed to three cases to support this conclusion: (1) *Havens Realty Corp. v. Coleman*, 455 U.S.
363 (1982), where the Supreme Court held that tester plaintiffs have standing under the Fair
Housing Act; (2) *Watts v. Boyd Props.*, 758 F.2d 1482 (11th Cir. 1985), where we recognized
tester standing under 42. U.S.C. § 1982; and (3) *Tandy v. City of Wichita*, 380 F.3d 1277 (10th
Cir. 2004), where the Tenth Circuit permitted a tester to sue under Title II of the ADA.  *Houston*,
733 F.3d at 1330–32.  Ultimately, we held that "alleged violations of [a plaintiff's] statutory
rights under Title III may constitute an injury-in-fact, even though he is a mere tester of ADA
compliance." *Id.* at 1334.  Because Title II and Title III of the ADA are similarly worded and
have similar purposes, it is likely that Sierra would still have standing to bring this claim as a
tester plaintiff.

Beach published videos on its website that he accessed but could not understand. We conclude, therefore, that he suffered a concrete and particularized injury and has standing to pursue this claim.[4]  And we accordingly vacate the district court's order dismissing the suit on standing grounds.

## IV.

After the district court found that Sierra did not have standing to sue, it alternatively stated that "even if [Sierra] had standing," Hallandale Beach would prevail because "the record evidence does not establish intentional discrimination." Our precedent is clear that a court cannot rule on the merits of a case after finding that the plaintiff lacks standing.  *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1189 (11th Cir. 2003); *Goodman ex rel. Goodman v. Sipos*, 259 F.3d 1327, 1331 n.6 (11th Cir. 2001) ("[A] grant of summary judgment is a decision on the merits . . . [but] a court must dismiss a case without ever reaching the merits if it concludes that it has no jurisdiction.").  Therefore, the district court's statement about intentional discrimination was merely dicta—not a ruling on the merits.

---

[4] Sierra also alleges that he was injured because he was humiliated, embarrassed, and frustrated when he could not understand the videos.  These allegations further indicate that he suffered a concrete and particularized injury, as we have already recognized that plaintiffs may recover damages for emotional distress for a violation of section 504 of the Rehabilitation Act.  *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1198 (11th Cir. 2007) ("Emotional damages are plainly a form of compensatory damages designed to 'make good the wrong done.'"); *see also Lyons*, 461 U.S. at 107 n.8 ("Of course, emotional upset is a relevant consideration in a damages action.").

Accordingly, the district court should revisit and decide anew the merits of this case on remand.

## V.

The district court applied an incorrect test to determine that Sierra did not suffer an injury in fact.  Sierra sufficiently alleged a stigmatic injury and therefore has standing to bring his claim alleging a violation of the ADA and the Rehabilitation Act.  Thus, the district court's dismissal was in error.  We vacate and remand for further proceedings consistent with this opinion.

**VACATED and REMANDED.**

NEWSOM, Circuit Judge, concurring:

I agree that Eddie Sierra has suffered an "injury in fact" as that phrase has come to be understood in Article III standing doctrine.  Accordingly, I join the Court's opinion.  I write separately to explain why, following several pretty unsatisfying encounters with it, I've come to doubt that current standing doctrine— and especially its injury-in-fact requirement—is properly grounded in the Constitution's text and history, coherent in theory, or workable in practice.  I'd like to propose a different way of thinking about things, in two parts.  First, in my view, a "Case" exists within the meaning of Article III, and a plaintiff thus has what we have come to call "standing," whenever he has a legally cognizable cause of action, regardless of whether he can show a separate, stand-alone factual injury.  Second, however—and it's a considerable "however"—Article II's vesting of the "executive Power" in the President and his subordinates prevents Congress from empowering private plaintiffs to sue for wrongs done to society in general or to seek remedies that accrue to the public at large.  It has taken me a while to come to this conclusion, and unpacking it will likewise take some doing.

## I

### A

It is now all but gospel that any plaintiff bringing suit in federal court must satisfy what the Supreme Court has called the "irreducible minimum" of Article III

standing. *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). In particular, a plaintiff must show that he suffered "(1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The first, "injury in fact" requirement further divides into several subtests. To qualify for injury-in-fact status, a plaintiff's injury must be (1) "concrete," not "abstract," (2) "particularized," not "generalized," and (3) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* at 1548; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408–09 (2013); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 217–18 (1974). A plaintiff's standing is a question of subject-matter jurisdiction, which a court must independently ascertain before proceeding to the merits of the case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).

Despite nearly universal consensus about standing doctrine's elements and sub-elements, applying the rules has proven far more difficult than reciting them. Consider just the "concrete[ness]" component of the injury-in-fact requirement. Since *Spokeo* was decided, courts considering the same statute have found that seemingly slight factual differences distinguish the qualifyingly "concrete" from the disqualifyingly "abstract." We have held, for instance, that receiving an

unwanted phone call in violation of the Telephone Consumer Protection Act is a
concrete injury, but receiving an unwanted text message in violation of the Act is
not. *Compare Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1270 (11th Cir. 2019),
*with Salcedo v. Hanna*, 936 F.3d 1162, 1169–70 (11th Cir. 2019). Likewise, while
we have held that printing 10 digits of a customer's credit card on a receipt in
violation of the Fair and Accurate Credit Transactions Act does not give rise to a
concrete injury, another circuit has held that printing 16 digits does. *Compare
Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 922, 934 (11th Cir. 2020) (en
banc), *with Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1066–67 (D.C. Cir.
2019).

Similarly, and to make matters worse, the courts have divided over whether
certain statutory violations are *per se* injuries in fact. For instance, the Second and
Sixth Circuits have held that any plaintiff who receives an objectively misleading
debt-collection letter in violation of the Federal Debt Collection Practices Act
suffers a concrete injury. *See Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d
75, 81–82 (2d Cir. 2018); *Macy v. GC Servs. Ltd. P'ship*, 897 F.3d 747, 756–58
(6th Cir. 2018). We, by contrast, have joined the D.C. Circuit in holding that there
is no concrete injury unless the letter actually misled the plaintiff herself. *See
Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1001–02 (11th Cir. 2020);
*Frank v. Autovest, LLC*, 961 F.3d 1185, 1188 (D.C. Cir. 2020).

These inter- and intra-circuit tensions and conflicts come as no surprise to me.  I've experienced firsthand the challenge (and consternation) of trying to distinguish the "concrete" from the "abstract," the "particularized" from the "generalized."  *See, e.g.*, *Flat Creek Transp., LLC v. Fed. Motor Carrier Safety Admin.*, 923 F.3d 1295, 1300–01 (11th Cir. 2019) (Newsom, J.) (holding that a trucking company failed to allege a concrete injury where it asserted that it was at risk of an unsatisfactory safety rating, which, in turn, could subject it to intrusive compliance reviews); *Gardner v. Mutz*, 962 F.3d 1329, 1341, 1343 (11th Cir. 2020) (Newsom, J.) (holding that taxpayers seeking to prevent the relocation of a Confederate monument lacked a concrete injury and that their interests, among others, in "preserv[ing] the history of the south" and "expressing their free speech[] from a Southern perspective" were too "amorphous" to confer standing); *In re Breland*, 989 F.3d 919, 922 (11th Cir. 2020) (Newsom, J.) (holding that a debtor suffered a concrete Article III injury in fact when a bankruptcy court appointed a trustee to administer his Chapter 11 estate, thereby deposing him as debtor-in-possession and stripping him of certain statutory rights vis-à-vis his property); *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 994 F.3d 1341, 1345–49 (11th Cir. 2021) (Newsom, J.) (holding that a consumer suffered a concrete injury under the Fair Debt Collection Practices Act when a debt collector transmitted his personal information to a third-party vendor); *Losch v. Nationstar Mortg. LLC*,

2021 WL 1653016, at *2–4 (11th Cir. Apr. 28, 2021) (Newsom, J.) (holding that a

consumer suffered a concrete injury under the Fair Credit Reporting Act when a

credit reporting agency reported inaccurate information on his credit report).

And indeed, if it weren't for Supreme Court precedent specifically

recognizing "stigmatic injury," this case might raise similarly difficult questions.

*See Allen v. Wright*, 468 U.S. 737, 757 n.22 (1984) ("[S]tigmatic injury, though not

sufficient for standing in the abstract form in which their complaint asserts it, is

judicially cognizable to the extent that respondents are personally subject to

discriminatory treatment.").  After all, it's tough to explain exactly why Eddie

Sierra's inability to access online videos—even videos "relat[ed] to topics of

special importance" to him—constitutes a concrete injury simply because he

alleges that he "felt humiliated, frustrated, and embarrassed at not being able to

understand the video content . . . ."  Humiliation, frustration, and embarrassment

sound to me a lot like the kinds of harms that courts have historically *rejected* for

Article III standing purposes.  *See Valley Forge*, 454 U.S. at 485 ("[T]he

psychological consequence presumably produced by observation of conduct with

which one disagrees . . . is not an injury sufficient to confer standing under Art.

III."); *see also Kondrat'yev v. City of Pensacola*, 949 F.3d 1319, 1336 (11th Cir.

2020) (Newsom, J., concurring) (questioning the line in existing doctrine between

the insufficient "psychological" injury and the sufficient "metaphysical" and "spiritual" injuries).

In deciding cases in the wake of *Spokeo*, I've come to the view—reluctantly, but decidedly—that our Article III standing jurisprudence has jumped the tracks. In the discussion that follows, I'll try to explain when and where the train derailed by retracing the injury-in-fact requirement's genesis and subsequent transformation. I'll then attempt to lay out the textual, historical, and logical case against current standing doctrine.

## B

"Injury in fact" isn't a particularly old concept. It made its first appearance in a Supreme Court opinion about 50 years ago—and thus about 180 years after the ratification of Article III—in *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150 (1970).[1] The plaintiffs there sued under the Administrative Procedure Act, which provides for judicial review for any person "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Sellers of data-processing services challenged a new rule promulgated by the Comptroller of the Currency permitting banks to

---

[1] Modern standing doctrine's second and third elements, causation and redressability, were constitutionalized soon thereafter in *Warth v. Seldin*, 422 U.S. 490, 504–05 (1975). *See* Steven L. Winter, *The Metaphor of Standing and the Problem of Self-Governance*, 40 Stan. L. Rev. 1371, 1373 n.9 (1988).

enter their market, claiming that they were injured by the resulting competition.
*Data Processing*, 390 U.S. at 151–52.

At the time, it was well-understood, and had been for decades, that a
plaintiff could sue only for the violation of a legal right—"one of property, one
arising out of contract, one protected against tortious invasion, or one founded on a
statute which confers a privilege." *Tenn. Elec. Power Co. v. Tenn. Valley Auth.*,
306 U.S. 118, 137–38 (1939).  Under that rule, the *Data Processing* plaintiffs
would lack standing, as they likely hadn't suffered any such violation.  They had
only "factual" harm—again, the economic harm that resulted from increased
competition.  *Data Processing* didn't repudiate the legal-right rule, but rather
supplemented it, explaining that a plaintiff who had suffered an "injury in fact"
also had standing to sue—at least under the APA.  397 U.S. at 152–53.  In
allowing the suit to proceed, the Court offered little explanation for the injury-in-
fact gloss, its origin, or how it related to the text or history of Article III, which, of
course, extends the "judicial Power" to "Cases" and "Controversies."  U.S. Const.
art. III, § 2.  Instead, the Court simply said that "[w]here statutes are concerned, the
trend is toward enlargement of the class of people who may protest administrative
action." *Id.* at 154.

Clearly, then, in terms of doctrinal innovation, *Data Processing*'s appeal to
the notion of an "injury in fact" was an effort to expand, rather than contract, the

category of parties who could bring suit in federal court to challenge governmental action:  A plaintiff suing under the APA needn't have suffered an invasion of a *legal* right, as defined by statute—only an injury in *fact*.  The Court thus treated the requirement of an injury in fact as a complement to the usual injuries at law for standing purposes.  After *Data Processing*, those who had suffered injury in fact, like those who had suffered a cognizable legal injury, had standing to sue.  *See* Elizabeth Magill, *Standing for the Public: A Lost History*, 95 Va. L. Rev. 1131, 1160–62 (2009).

This complementary understanding of injury in fact, however, was short-lived.  The Supreme Court began to chip away at it in the years immediately after *Data Processing*.  In *Warth v. Seldin*, 422 U.S. 490, 500 (1975), and *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38–39 (1976), the Court explained that the injury-in-fact concept wasn't derived from the APA's phrase "aggrieved by agency action," but rather was part of the constitutional floor—and thereby implied that every violation of a *legal* right had to be accompanied by *factual* injury.

The Supreme Court's landmark decision in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), confirmed what *Warth* and *Simon* had suggested:  Injury in fact was part and parcel of Article III, an independent constitutional requirement. *Lujan* addressed the question whether the citizen-plaintiffs there could sue

executive actors under the Endangered Species Act.  Section 7(a)(2) of the Act

required federal agencies, "in consultation with" the Secretary of the Interior, to

"[e]nsure that any action" did not "jeopardize the continued existence of any

endangered species."  *Id.* at 558.  In 1986, the Fish and Wildlife Service and the

National Marine Fisheries Service promulgated a joint regulation concerning the

geographic scope of § 7(a)(2)'s consultation requirement.  *Id.* at 558–59.  The joint

regulation interpreted § 7(a)(2) to require consultation with the Secretary only for

actions taken in the United States or on the high seas, not for those taken abroad.

*Id.* at 559.

Challenging the regulation as too permissive, environmental- and wildlife-

advocacy organizations sued the Secretary pursuant to the Act's citizen-suit

provision, 16 U.S.C. § 1540(g), which broadly authorized "any person" to sue for a

violation of the Act.  They sought both a declaratory judgment that the new

regulation unlawfully narrowed § 7(a)(2)'s geographic scope and an injunction

requiring the Secretary to promulgate a new, broader rule.  *See* 504 U.S. at 559.

Focusing on the recently minted injury-in-fact requirement, the Supreme

Court held that the plaintiffs lacked standing.  *Id.* at 562.  To begin, the Court

summarily disposed of the plaintiffs' contention that their "some day" intentions to

return to foreign countries to observe endangered species amounted to an "actual

or imminent" injury.  *Id.* at 564.  The Court similarly rejected the plaintiffs'

theories of "ecosystem nexus," "animal nexus," and "vocational nexus" standing,
which variously argued that the plaintiffs' participation in the general ecosystem,
their interest in particular animals, or their vocations gave them the right to sue.
*Id.* at 565–67.

Most importantly for present purposes, the Court also rebuffed the plaintiffs'
contention that they had standing to sue by virtue of the Act's citizen-suit
provision, which authorizes "any person" to "commence a civil suit on his own
behalf . . . to enjoin any person, including the United States and any other
governmental instrumentality or agency . . . who is alleged to be in violation of any
provision of this chapter." 16 U.S.C. § 1540(g); *Lujan*, 504 U.S. at 571–78. As
the Court framed it, the question was "whether the public interest in proper
administration of the laws (specifically, in agencies' observance of a particular,
statutorily prescribed procedure) can be converted into an individual right by a
statute that denominates it as such, and that permits all citizens . . . to sue." 504
U.S. at 576–77. In other words, the Court asked, could it really be that any private
citizen, by dint of a statute seemingly authorizing him to do so, was empowered to
police an executive agency's affairs? In the Court's view, to ask the question was
to answer it. Given what it called the "separation-of-powers significance" of
Article III's "concrete injury requirement," the answer was "obvious":

> To permit Congress to convert the undifferentiated public interest in
> executive officers' compliance with the law into an "individual right"

> vindicable in the courts is to permit Congress to transfer from the President to the courts the Chief Executive's most important constitutional duty, to "take Care that the Laws be faithfully executed," Art. II, § 3.  It would enable the courts, with the permission of Congress, "to assume a position of authority over the governmental acts of another and co-equal department," and to become "virtually continuing monitors of the wisdom and soundness of Executive action."

*Id.* at 577 (citations omitted).

The Court explained that because the concrete-injury requirement has this separation-of-powers significance, a plaintiff can't sue unless he shows that he has suffered such an injury—even if, as was the case there, a statute creates a legal right and authorizes private actions.[2]  The Court recognized that it had to square its holding with preexisting precedent recognizing that "[t]he . . . injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'"  *Id.* at 578 (quoting *Warth*, 422 U.S. at 500).  It did so by explaining that those cases stood for a more limited principle—namely, that Congress can elevate to legally cognizable status those injuries that were already concrete but previously inadequate at law.  *Id.*  In other words, Article III imposes

---

[2] Justice Kennedy's concurrence didn't read the majority opinion so broadly.  In his view, "Congress must at the very least identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring suit."  504 U.S. at 580 (Kennedy, J., concurring).  The Endangered Species Act's citizen-suit provision didn't "meet these minimal requirements, because while the statute purports to confer a right on 'any person . . . to enjoin . . . the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter,' it does not of its own force establish that there is an injury in 'any person' by virtue of any 'violation.'"  *Id.* (quoting 16 U.S.C. § 1540(g)(1)(A)).  As explained in text, however, even if *Lujan* itself could be so narrowly construed, subsequent cases haven't adopted Justice Kennedy's construction.

an "irreducible minimum" that requires even a legally cognizable injury either (1) to result in an injury in fact or (2) itself to constitute an injury in fact.  *Lujan* thus made clear that the injury-in-fact requirement was a hard floor imposed by Article III, which Congress couldn't lower by statute.  In so holding, the Court completed injury in fact's transformation from a *supplement* to injuries at law conferring standing—as *Data Processing* had explained it—to a *limitation* on which injuries at law could confer standing.

Any doubt that *Lujan* might have left about whether the invasion of a statutory right necessarily constitutes the requisite injury for standing purposes was dispelled in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016).  The plaintiff there alleged that the defendant disseminated inaccurate information about him in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq*.  *Spokeo*, 136 S. Ct. at 1544.  Section 1681e(b) of the FCRA, for instance, requires consumer reporting agencies to "follow reasonable procedures to assure maximum possible accuracy" of their reports.  The Act also expressly states that any entity that "fails to comply with any requirement [of the Act] with respect to any consumer is liable to that consumer" for damages.  15 U.S.C. §§ 1681n, 1681*o*.

Importantly here, the Court reiterated in *Spokeo* what it had said in *Lujan*: Even taken together, Congress's creation of (1) a statutory right and (2) a remedy by which to enforce it will not necessarily give an affected individual Article III

standing.  A plaintiff does not "automatically satisf[y] the injury-in-fact

requirement," the Court explained, "whenever a statute grants a person a statutory

right and purports to authorize that person to sue to vindicate that right."  *Spokeo*,

136 S. Ct. at 1549.  Rather, the Court held, any statutorily defined injury must

independently satisfy Article III's requirement of "concreteness."  *Id.* at 1548.  A

concrete injury, the Court elaborated, is one that "actually exist[s]," *i.e.*, is "*de

facto*," "real," and "not abstract"—but, the Court acknowledged, not necessarily

one that is "tangible."  Repeating *Lujan*'s effort to reconcile the concreteness

requirement with the principle that Congress can elevate to legally cognizable

status injuries previously inadequate at law, the Court again explained that

Congress can do so only with respect to injuries that are already concrete.  *Id*. at

1548–49.

How, though, is a court to identify those statutory injuries that are already

"*de facto*," "real," and "not abstract"?  In other words, when Congress creates

some new right and prescribes a judicial remedy by which to enforce it, when is

the injury that results from a violation of that newly defined right sufficiently

"concrete"?  The *Spokeo* Court attempted to answer that question by providing two

guideposts: "history" and "the judgment of Congress."  *Id*. at 1549.  Specifically,

courts should ask (1) whether a plaintiff's alleged harm has "a close relationship to

a harm that has traditionally been regarded as providing a basis for a lawsuit in

English or American courts" and (2) whether Congress has identified concrete interests underlying the statutory injury.  *Id.*  But the Court offered little guidance for applying these criteria; rather than deciding the case, it remanded for the court of appeals to decide whether the injuries resulting from the alleged FCRA violations passed Article III muster.  *Id.* at 1550.

*Spokeo* has raised more questions than it answered.  Just how closely analogous to a common-law tort must an alleged injury be in order to be "concrete"?  Just how old must a common-law tort be in order to qualify as having been "traditionally . . . regarded as providing a basis for a lawsuit in English or American courts"?  And just what does the "judgment of Congress" have to do with the concreteness, realness, or actual existence of an injury?  We and other courts have attempted to answer these (and other) questions, but they remain largely unsettled.[3]

_____

[3] With respect to the first question, see, *e.g.*, *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 932 (11th Cir. 2020) (en banc) (noting that the "fit between a traditionally understood harm and a more recent statutory cause of action need not be perfect" but that a "strained" relationship to a common-law tort is insufficient).  With respect to the second, compare, *e.g.*, *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1341 (11th Cir. 2017) (holding that the tort of "invasion of privacy," which the court traced to the early 1900s, was sufficiently "traditional[]" to provide a valid analogy under *Spokeo*), with, *e.g.*, *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 871 (6th Cir. 2020) (Murphy, J., concurring in part and dissenting in part) (suggesting that a common-law cause of action must trace its origin to the Founding era to provide a valid *Spokeo* analogy).  And with respect to the third, compare, *e.g.*, *Trichell*, 964 F.3d at 999 (positing that "Congress's role in our assessment of Article III standing is necessarily limited" and that "in adjudicating cases or controversies (or determining whether they exist), federal courts must decide for themselves whether applicable statutes are consistent with the Constitution"), with, *e.g.*, *Huff v. Telecheck Servs., Inc.*, 923 F.3d 458, 466–67 (6th Cir. 2019) (explaining that

\* \* \*

At bottom, *Lujan* and *Spokeo* ask courts to draw bright lines between injuries that are "real" and "concrete," even if not "tangible"—and thus may satisfy Article III—and those that are "abstract"—and thus necessarily cannot; between statutory violations that "can be sufficient in some circumstances" to constitute Article III injuries and "bare" violations, which cannot; and between the circumstances in which the risk of real harm is "material" and those in which it is not. *See, e.g.*, *id.* at 1548–50. The net result—as the disparate court-of-appeals caselaw shows—has been a doctrine that is difficult to apply in practice and (at least arguably) incoherent in theory. Returning to first principles, I hope to show that our current Article III standing doctrine can't be correct—as a matter of text, history, or logic.

## C

### 1

I start, as always, with the text. As the leading federal-courts treatise quips, "[d]espite the clarity with which the Court articulates the elements of standing, the Constitution contains no Standing Clause." Richard H. Fallon, Jr. et al., *Hart & Wechsler's The Federal Courts and the Federal System* 101 (7th ed. 2015). The

---

Congress's judgment about what intangible injuries suffice for standing purposes "can instruct and guide," as it does in Commerce Clause and Fourteenth Amendment jurisprudence).

Supreme Court, of course, has said that standing doctrine derives from Article III's

statement that "[t]he judicial Power shall extend" to nine specific categories of

"Cases"—for instance, those "arising under . . . the Laws of the United States"—

and "Controversies"—for instance, those "between citizens of different States."

U.S. Const. art. III, § 2.[4]

But despite the oft-repeated invocations of it, nothing in Article III's

language compels our current standing doctrine, with all its attendant rules about

the kinds of injuries—"concrete," "particularized," "actual or imminent"—that

suffice to make a "Case."  Perhaps Justice Scalia, writing for the Court in *Lujan*,

put it best:  "To be sure, [the Constitution] limits the jurisdiction of federal courts

to 'Cases' and 'Controversies,' but an executive inquiry can bear the name 'case'

---

[4] In full:

> The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

U.S. Const. art. III, § 2.  Throughout this opinion, when quoting Article III, I refer to the word "Case" without alteration so as to avoid repeating the clunky "Case[]."  Moreover, I refer primarily to "Cases" rather than "Controversies," as it is generally accepted that the former encapsulates the latter.  *See, e.g.*, *Muskrat v. United States*, 219 U.S. 346, 356–57 (1911); *In re Pac. Ry. Comm'n*, 32 F. 241, 255 (C.C.N.D. Cal. 1887) (Field, J.) ("The term 'controversies,' if distinguishable at all from 'cases,' is so in that it is less comprehensive than the latter, and includes only suits of a civil nature."); *see also* John Harrison, *The Power of Congress to Limit the Jurisdiction of Federal Courts and the Text of Article III*, 64 U. Chi. L. Rev. 203, 210 (1997) (same).

(the Hoffa case) and a legislative dispute can bear the name 'controversy' (the Smoot-Hawley controversy)." *Lujan*, 504 U.S. at 559.  Accordingly, as he explained elsewhere, standing doctrine's location in Article III was never "linguistically inevitable"; the Court used Article III's case-or-controversy language to constitutionalize standing, at least in part, "for want of a better vehicle."  Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983).  To my mind, though, judges shouldn't be surveying the constitutional landscape in search of "vehicle[s]" through which to implement rules that the document's provisions, plainly read, don't establish.

There is a far more natural and straightforward reading of the word "Case" than one that turns on the existence of an "injury in fact":  An Article III "Case" exists so long as—and whenever—a plaintiff has a cause of action, whether arising from the common law, emanating from the Constitution, or conferred by statute. And a plaintiff has a cause of action, as I use the term here, whenever he can show (1) that his legal rights have been violated and (2) that the law authorizes him to seek judicial relief.  *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).[5]

---

[5] As the Supreme Court has recognized, the term "cause of action" "may mean one thing for one purpose and something different for another."  *Davis v. Passman*, 442 U.S. 228, 237 (1979) (quoting *United States v. Memphis Cotton Oil Co.*, 288 U.S. 62, 67–68 (1933)).  My usage refers to the existence of both a legal right and a corresponding legal remedy.  I don't use the term, therefore, to refer either to a legal right only, as when one says that her legal right has been violated so she has a "cause of action for a remedy," *see* Anthony J. Bellia Jr., *Article III and the*

This "cause of action"-based understanding of the term "Case" follows directly from both its ordinary meaning and its traditional usage in the courts. One early American dictionary defined "case" to mean "[a] cause or suit in court; as, the case was tried at the last term." *Case*, Webster's American Dictionary of the English Language (1828). It continued: "In this sense, case is nearly synonymous with cause, whose primary sense is nearly the same." *Id.*; *see also Cause*, *id.* (defining "cause" as "[a] suit or action in court . . . by which he seeks his right or his supposed right" and explaining that this definition "coincide[d] nearly with case from *cado*"). This early understanding of "Case" persists in ordinary usage today. *See Case*, *Webster's New International Dictionary* 415 (2d ed. 1944) (defining "case," in relevant part, as "a suit or action in law or equity; a cause"). Perhaps not surprisingly, courts have likewise traditionally used the term just this way. As the Supreme Court explained long ago, "[t]he words 'case' and 'cause' are constantly used as synonyms in statutes and judicial decisions, each meaning a proceeding in court, a suit, or action." *Blyew v. United States*, 80 U.S. (13 Wall.) 581, 595 (1872); *see also Muskrat v. United States*, 219 U.S. 346, 356 (1911) ("A 'case' was defined by Mr. Chief Justice Marshall as early as . . . *Marbury v. Madison* to be a suit instituted according to the regular course of judicial

---

*Cause of Action*, 89 Iowa L. Rev. 777, 781 (2004), or a judicial remedy only, as when one says that § 1983 provides a plaintiff a "cause of action" to sue for violation of his rights under a federal statute, *cf. Gonzaga Univ. v. Doe*, 536 U.S. 273, 283–84 (2002).

procedure."); *Kundolf v. Thalheimer*, 12 N.Y. 593, 596 (1855) ("The primary meaning of the word case, according to lexicographers, is *cause*.").

So, it seems to me, as a matter of plain text, a plaintiff who has a legally cognizable cause of action has a "Case" within the meaning of Article III.

**2**

Evidence regarding the sorts of suits that courts routinely heard in the years surrounding the Founding further supports reading the term "Case" as synonymous with a cause of action. In particular, the English and American courts' historical treatment of (1) suits for nominal damages, (2) *qui tam* actions, and (3) criminal prosecutions shows that the original understanding of the term "Case" included no stand-alone requirement of a factual injury, separate and apart from a legally cognizable cause of action.

Start with actions for nominal damages. At common law, courts regularly awarded nominal damages when a plaintiff suffered a legal injury but either didn't seek or couldn't prove compensatory damages. *See, e.g.*, *Robinson v. Byron*, (1788) 30 Eng. Rep. 3, 3 (awarding nominal damages for violation of riparian rights); *Marzetti v. Williams*, (1830) 109 Eng. Rep. 842, 846 (KB) (Parke, J.) ("[W]herever there is a breach of contract, or any injury to the right arising out of that contract, nominal damages are recoverable."); *see also Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 798 (2021) (collecting sources). In the English

29

tradition, it was well-understood that for many torts, no showing of actual harm was required to obtain judicial relief. *See* 3 William Blackstone, Commentaries *120–24; 1 Theodore Sedgwick, *A Treatise on the Measure of Damages* 166 (9th ed. 1920) ("Wherever the breach of an agreement or the invasion of a right is established, the English law infers some damage to the plaintiff."). For instance, Blackstone explained that in an action for assault, "the party injured may have redress by action of *trespass vi et armis*" even "though no actual suffering is proved." 3 Blackstone, Commentaries *120. The same was true for battery: "The least touching of another's person wilfully . . . is a battery; for the law cannot draw the line between different degrees of violence." *Id.* This rule, Blackstone explained, had its roots in Roman law: "[T]he Cornelian law *de injuriis* prohibited *pulsation* as well as *verberation*; distinguishing verberation, which was accompanied with pain, from pulsation, which was attended with none." *Id.*

Early American courts followed suit. Actions for trespass, libel, breach of contract, assault, and battery were all cognizable even in the absence of observable harm. As Justice Story explained while riding circuit, "every violation imports damage; and if no other be proved, the plaintiff is entitled to a verdict for nominal damages." *Webb v. Portland Mfg. Co.*, 29 F. Cas. 506, 509 (C.C.D. Me. 1838) (No. 17,322). This principle, he explained elsewhere, was "well-known and well-settled." *Whipple v. Cumberland Mfg. Co.*, 29 F. Cas. 934, 936 (C.C.D. Me. 1843)

(No. 17,516).  And importantly, it wasn't limited to common-law actions, but also applied to new rights that Congress created by statute.  *See* Act of May 31, 1790, ch. 15, § 2, 1 Stat. 124, 124–25 (imposing statutory damages for copyright infringement even in the absence of monetary loss); *Whittemore v. Cutter*, 29 F. Cas. 1120, 1121 (C.C.D. Mass. 1813) (No. 17,600) (Story, J.) (rejecting the argument that no claim could lie under the Patent Act of 1793, Act of Feb. 21, 1793, ch. 11, § 5, 1 Stat. 318, without a showing of actual damages); *Muransky*, 979 F.3d at 972 (Jordan, J., dissenting) (collecting sources and explaining the same).[6]

Just as actions for nominal damages showed that factual harm wasn't necessary to create a "Case," the common law principle *damnum absque injuria* demonstrated that the existence of a factual injury wasn't sufficient.  As the Supreme Court long ago explained, even an actual, real-world harm, if unaccompanied by a violation of a recognized legal right, "does not lay a foundation for an action":

> [I]njury, legally speaking, consists of a wrong done to a person, or, in other words, a violation of his right.  It is an ancient maxim, that a

---

[6] This Term, the Supreme Court recited this history of nominal-damages actions for the same proposition:  Every injury imports a damage.  *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 799 (2021).  How, though, can that result be squared with current doctrine's requirement of an injury "in fact"?  The Court didn't answer that question, as the parties there stipulated that the plaintiff had suffered an Article III injury in fact.  *Id.* at 797.  But the dissent recognized the issue, and thus charged the Court with holding, in effect, that every "request for nominal damages guarantees entry to court."  *Id.* at 808 (Roberts, C.J., dissenting).  I agree, but in my view—for reasons I will explain—such a result does no violence to Article III.

> damage to one, without an injury in this sense (*damnum absque injuria*), does not lay the foundation of an action; because, if the act complained of does not violate any of his legal rights, it is obvious, that he has no cause to complain.

*Ala. Power Co. v. Ickes*, 302 U.S. 464, 479 (1938) (quoting *Parker v. Griswold*, 17 Conn. 288, 302–03 (1845)).  Professor Sedgwick summarized *damnum absque injuria* this way:  "There must not only be loss, but it must be injuriously brought about by a violation of the legal rights of others."  1 Sedgwick, *supra*, at 28.

The twin concepts of actions for nominal damages and *damnum absque injuria* thus show (1) that a legal injury can exist without an injury "in fact," (2) that an injury "in fact" doesn't necessarily entail a legal injury, and thus (3) that injury "in fact" was neither a necessary nor a sufficient condition for an Article III "Case."  By contrast, the same concepts demonstrate that the existence of a legal injury—an injury at law—was *both* a necessary *and* a sufficient condition.

Consider, next, the history of *qui tam* and informer actions—suits brought by individuals standing in the government's shoes.  From the very outset, Congress has enacted statutes that allowed private plaintiffs to bring suit on behalf of the federal government and recover for violations of law that caused them no personal injury.  For instance, in 1789, the First Congress passed a law authorizing informers to sue government officials for a penalty if they failed to publish their rates of fees and duties.  *See* Act of July 31, 1789, ch. 5, § 29, 1 Stat. 29, 44–45. The Second, Third, and Fourth Congresses enacted similar statutes in the years that

followed.  *See, e.g.*, Act of Mar. 3, 1791, ch. 15, § 44, 1 Stat. 199, 209 (authorizing

informers who seized or discovered the importation of untaxed liquor to sue to

obtain a bounty); Act of Mar. 22, 1794, ch. 11, § 2, 1 Stat. 347, 349 (authorizing a

bounty for a private citizen who prosecuted one engaged in slave trade with foreign

nations); Act of May 19, 1796, ch. 30, § 18, 1 Stat. 469, 474 (authorizing a bounty

for a private citizen who first brings a prosecution against one engaged in

prohibited trade with Indian tribes).  Individuals were expressly authorized to sue

under these statutes even though they hadn't suffered any personal harm.  And

such statutes weren't rare, but rather were common and ordinary, as Chief Justice

Marshall explained in *Adams v. Woods*:  "Almost every fine or forfeiture under a

penal statute, may be recovered by an action of debt, as well as by information

. . . ."  6 U.S. (2 Cranch) 336, 341 (1805) (concerning Act of Mar. 22, 1794, ch. 11,

§ 2).  Later Supreme Court decisions involving *qui tam* actions similarly—and

consistently—accepted that plaintiffs could sue in the absence of any personal

harm.  As the Supreme Court explained in *Marvin v. Trout*, a century after *Adams*,

"[t]he right to recover the penalty or forfeiture granted by statute is frequently

given to the first common informer who brings the action, although he has no

interest in the matter except as such informer."  199 U.S. 212, 225 (1905); *see also*

*United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 (1943).  Again, then,

"injury in fact" was neither necessary nor sufficient; a cause of action was both.

One last piece of evidence comes from a conspicuous (if unlikely) source: the history of criminal prosecutions. Of course, no one doubts—or ever doubted—that federal criminal prosecutions are "Cases" within the meaning of Article III. But other than offenses that involve fraud on the government or harm to its property, what concrete, particularized "injury in fact" does the United States suffer that confers standing in criminal prosecutions? *See* Edward A. Hartnett, *The Standing of the United States: How Criminal Prosecutions Show that Standing Doctrine Is Looking for Answers in All the Wrong Places*, 97 Mich. L. Rev. 2239, 2246–49 (1999). One might contend, of course, that the injury is one "to [the United States's] sovereignty arising from violation of its laws." *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000). But if symbolic harm to the United States's "sovereignty" constitutes a "concrete" and "particularized" injury with respect to *any* violation of federal law, then those words, it seems to me, have ceased to have any real meaning.[7]

---

[7] Another response to the criminal-prosecution conundrum has been to suggest that the word "Case" may be party-specific: "[I]nvasions of public rights that cause diffuse injuries to the general public might support a 'Case' between the public and the malefactor but not between any single individual and the malefactor." Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 695 (2004). But, to my mind, that argument doesn't directly answer the question: It essentially posits that the requirements of concreteness and particularization don't apply to the United States, *not* that the United States suffers a concrete and particularized injury. But if concreteness and particularization are indeed part of Article III's "irreducible minimum," it's unclear why those requirements wouldn't apply to a suit brought by the United States. *Cf.* U.S. Const. art. III, § 2 (extending the "judicial Power" to "controversies to which the United States shall be a party"). As I explain below, it's true that

To be sure, there is some historical support for something that approximates an injury-in-fact requirement, though not in so many words.  The strongest evidence, it seems to me, comes from the common law of public nuisance.  Courts have traditionally prohibited private individuals from suing for public nuisance unless they can show "special injury."  In 1838, the Supreme Court explained "[t]he principle . . . that in case of public nuisance, where a bill is filed by a private person, asking for relief by way of prevention, the plaintiff cannot maintain a stand in a court of equity[,] unless he avers and proves some special injury."  *Mayor of City of Georgetown v. Alexandria Canal Co.*, 37 U.S. (12 Pet.) 91, 98–99 (1838); *accord, e.g.*, *Mississippi & Missouri R.R. Co. v. Ward*, 67 U.S. (2 Black) 485, 492 (1862).  Importantly, though, nothing the Court said linked the special-injury requirement to Article III, as opposed to the merits of the public-nuisance claim.[8] And in any event, it's clear from the history of *qui tam* actions and criminal prosecutions that "special injury" has never been a generalized requirement for *all* lawsuits.

---

different rules probably govern suits brought by private and public plaintiffs, but those rules flow from Article II, not Article III.

[8] Indeed, modern state courts—many of which lack an equivalent to Article III standing doctrine, *see* F. Andrew Hessick, *Standing in Diversity*, 65 Ala. L. Rev. 417, 424–26 (2013)—have understood the special-injury requirement as an element of the plaintiff's cause of action.  *See, e.g.*, *Hopi Tribe v. Ariz. Snowbowl Resort Ltd. P'ship*, 430 P.3d 362, 365–66 (Ariz. 2018) ("Rather than equating special injury with standing to sue, it is more apt to say that if that element is not sufficiently alleged or proven, a private plaintiff's public nuisance claim fails as a matter of law."); *Hale v. Ward Cnty.*, 848 N.W.2d 245, 251 (N.D. 2014); *In re Lead Paint Litig.*, 924 A.2d 484, 503–05 (N.J. 2007).

\* \* \*

The upshot:  If the Supreme Court means it when it says that "Article III's restriction of the judicial power to 'Cases' and 'Controversies' is properly understood to mean 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process," *Vermont Agency*, 529 U.S. at 774 (quoting *Steel Co.*, 523 U.S. at 102), then there's little defense for the current standing doctrine's injury-in-fact requirement.  Rather, both the ordinary meaning and traditional usage of the word "Case," as well as the sorts of actions that courts have historically entertained, indicate that an Article III "Case" exists whenever the plaintiff has a cause of action.

### 3

The absence of any solid grounding in Article III's text or history is enough to condemn modern standing doctrine's focus on whether the plaintiff suffered an "injury in fact" rather than on whether the plaintiff has a cause of action.  But there's more.  The injury-in-fact fixation has produced a doctrine that is both at risk of manipulation and conceptually incoherent.

### a

My colleague Judge Jordan has observed that because current standing doctrine lacks any solid anchor in text and history, it has devolved into "essentially a policy question." *Muransky*, 979 F.3d at 957 (Jordan, J., dissenting).  In retrospect, I agree with him.  Indeed, the analysis that modern standing doctrine

demands bears, I fear, an all-too-close resemblance to the doctrine of substantive

due process, which I've criticized before. *See Hillcrest Prop., LLP v. Pasco Cnty.*,

915 F.3d 1292, 1304–05 (11th Cir. 2019) (Newsom, J., concurring). This is true

both in standing's (d)evolution as a doctrine and in its application.

To explain the analogy, I begin with the well-worn critique of substantive

due process: That doctrine's most glaring defect is its incompatibility with the

constitutional text. *Id.* The Due Process Clauses of the Fifth and Fourteenth

Amendments prohibit deprivations of "life, liberty, or property, without due

process of law." U.S. Const. amends. V, XIV. A plain-text reading of the Clauses

suggests that they apply only to the executive and judicial branches, and not to the

legislature. *See Johnson v. United States*, 576 U.S. 591, 623 (2015) (Thomas, J.,

concurring) (explaining that due process of law was "a separation-of-powers

concept designed as a safeguard against unlicensed executive action, forbidding

only deprivations not authorized by legislation or common law" (quotation marks

omitted)). The reason is that when a legislative body passes a statute pursuant to

settled procedures, it acts *with* "due process of law"—the lawmaking process, put

simply, *is* due process, and thus cannot violate the Due Process Clauses.[9] By

---

[9] *But cf.* Nathan S. Chapman & Michael W. McConnell, *Due Process As Separation of Powers*,
121 Yale L.J. 1672, 1781–82 (2012) (contending that "[t]he basic idea of due process, both at the
Founding and at the time of adoption of the Fourteenth Amendment, was that the law of the land
required each branch of government to operate in a distinctive manner, at least when the effect
was to deprive a person of liberty or property" and that while "[t]he legislative branch could
enact general laws for the future, including the rules for acquisition and use of property," it

contrast, the Clauses straightforwardly apply to executive and judicial actors.  Due

process forbids them from arbitrarily depriving individuals of life, liberty, or

property; it demands—but demands only—that they obey the duly enacted positive

law when taking actions that might injure individuals.  *See id.*; *see also In re

Winship*, 397 U.S. 358, 378–82 (1970) (Black, J., dissenting).  As currently

applied, though, so-called "substantive due process" renders unconstitutional any

government action—even a duly enacted law—that "shocks [the] conscience,"

deprives a person of "fundamental fairness," or violates the principles "implicit in

the concept of ordered liberty."  *In re Winship*, 397 U.S. at 381–82 (Black J.,

dissenting) (collecting cases).

   There is, I suppose, a descriptively understandable—if ultimately

unjustifiable—story about the Due Process Clause's transformation from a purely

procedural limitation on executive and judicial action to a substantive limitation on

legislative power.  That story begins with the common-sense objection that if the

Clause imposed no limits whatsoever on the lawmaking power, then a legislature

could theoretically pass a statute authorizing executive or judicial officers to do

whatever they wanted, ignoring otherwise applicable procedures.  To prevent that

sort of end-run, courts engrafted onto the phrase "due process" a substantive

---

"could not assume the 'judicial' power of deciding individual cases" and thus "could not
retrospectively divest a person of vested rights that had been lawfully acquired under the rules in
place at the time").

limitation on legislative authority. *See Hurtado v. California*, 110 U.S. 516, 535–

36 (1884). But once it was accepted that "due process" was not just a formal

requirement ensuring executive and judicial obedience to duly enacted law, but

also a constraint on legislative power, it became all too easy for courts to

rationalize a gradual expansion of the category of substantive limitations. The rest

is history: Unmoored from the constitutional text, the doctrine drifted to open sea,

and searching for landmarks, courts turned to common-law tradition and (far

worse) their own policy and ethical intuitions. William Baude, *Standing in the*

*Shadow of Congress*, 2016 Sup. Ct. Rev. 197, 223–27 (2017); *see also* Timothy M.

Tymkovich, Joshua Dos Santos, & Joshua J. Craddock, *A Workable Substantive*

*Due Process*, 95 Notre Dame L. Rev. 1961, 1977–80 (2020) (collecting cases and

explaining evolution).

Standing doctrine, I'm sorry to say, seems little different. It mirrors

substantive due process both in its (d)evolution and in its on-the-ground

application. As to the former: Article III, which by its terms circumscribes the

"judicial Power," has somehow been transformed into a check on the *legislature's*

authority to pass substantive laws that create enforceable rights. What explains the

metamorphosis? As with substantive due process, one possibility is a worry about

an end-run. What if, for instance, Congress authorized any individual to file suit in

federal court for an advisory opinion? *See Huff v. Telecheck Servs., Inc.*, 923 F.3d

458, 465 (6th Cir. 2019) (contending that without a distinction between injury in law and injury in fact, Congress "could create injuries in law that require the federal courts to issue advisory opinions").  Perhaps to avoid that sort of circumvention, the Supreme Court—again understandably, if unjustifiably—transformed what on its face is a procedural limit on judicial actors into a substantive limit on Congress:  Congress can create enforceable rights, but only in plaintiffs who suffer certain kinds of injuries—namely, "concrete" injuries "in fact."  *See* Baude, *supra*, at 223–27.[10]

As a doctrine born largely of judicial creativity, perhaps it's no surprise that standing mimics substantive due process in application too.  Because substantive due process lacks any textual foundation, courts have resorted to vague shibboleths, asking whether some asserted personal right is "implicit in the concept

---

[10] When a court refuses jurisdiction over a case alleging the violation of a statutory right on the ground that the plaintiff lacks injury in fact, it essentially declares the statute conferring that right unenforceable—and, in a manner of speaking, unconstitutional.  Our decision in *Trichell v. Midland Credit Management, Inc.*, 964 F.3d 990 (11th Cir. 2020), illustrates the point.  *Trichell* involved a violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*  To establish a claim under § 1692e, which provides that "[a] debt collector may not use any false, deceptive, or misleading representation . . . in connection with the collection of any debt," a plaintiff need allege only that the collector's misrepresentation, although made to her, would be deceptive or misleading, in an objective sense, to the "least sophisticated consumer."  *Holzman v. Malcolm S. Gerald & Assocs., Inc.*, 920 F.3d 1264, 1269 (11th Cir. 2019).  But in *Trichell*, we held that an FDCPA plaintiff doesn't suffer an injury in fact—and thus can't proceed on his FDCPA claim—unless she alleges that she has been *personally* misled.  964 F.3d at 998.  In effect, then, our jurisdictional decision raised the *substantive standard* for what qualifies as a "misleading" representation:  To proceed with a suit, the plaintiff must allege that the representation she received was misleading not only to the least sophisticated consumer, but also to the consumer of her own sophistication.

of ordered liberty" or, only slightly better, "deeply rooted in this Nation's history

and tradition"—tests that the Court has occasionally (if inconsistently)

operationalized by appeal to the common law.  *See Washington v. Glucksberg*, 521

U.S. 702, 721 (1997); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (noting that

the "liberty guaranteed" by the due process clause "generally" includes "those

privileges *recognized at common law* . . . essential to the orderly pursuit of

happiness by free men" (emphasis added)).  The same is true of standing.  In

describing what counts as a "concrete" injury, the Court has provided a list of

weighty-sounding adjectives:  The injury must be "*de facto*," "real," and "not

abstract."  *Spokeo*, 136 S. Ct. at 1548 (quotation marks omitted).  And again,

lacking any meaningful textual anchor, the Supreme Court has—for want of any

other limit—directed courts to consult the common law.  *Id.* at 1549; *see also* Cass

R. Sunstein, *What's Standing After* Lujan*? Of Citizen Suits, "Injuries," and Article

III*, 91 Mich. L. Rev. 163, 192 (1992).  To be sure, the common law often properly

informs the interpretation of both statutory and constitutional texts.  *See, e.g.*,

*Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 447 (2003).

But when reference to the common law is altogether untethered from the governing

text, it can invite manipulable, policy-driven cherry-picking—as, I fear, it may

both when tackling the question whether a right is sufficiently important to qualify

for substantive-due-process protection and when deciding whether a plaintiff has

suffered an "injury in fact."

<strong>b</strong>

There's another reason why standing's injury-in-fact inquiry has devolved

into a policy judgment:  The question whether a party has been "injured" is

inescapably value-laden.  At risk of overstating the point, the very notion of a non-

normative injury "in fact" is conceptually incoherent; whether someone has been

injured is necessarily a normative question—injured, that is, by reference to what?

To make the point less obscure,[11] consider a series of vignettes, which I

confess to borrowing from then-Professor (now-Judge) Fletcher.  *See* William A.

Fletcher, *The Structure of Standing*, 98 Yale L.J. 221, 231–32 (1988).  First, a non-

legal example.  Suppose at Christmas this year, I lavish my older son with a trove

of riches, but I give my younger son nothing.  Has my younger son been injured?

Of course, in one sense, he's no worse off than he was before Christmas.  In

another sense, however, he has been injured, either due to a violation of some

---

[11] One reason why the basic insight—that there is no non-normative conception of injury—has been disguised is that there are reasonably well-established conventions for what counts as an injury.  Those conventions, unsurprisingly, preference observable physical and monetary harms. *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"); *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) (Kavanaugh, J.) ("A dollar of economic harm is still an injury-in-fact for standing purposes."); *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014) ("The consumers' alleged economic harm—even if only a few pennies each—is a concrete, non-speculative injury.").

ethereal "right" to receive a Christmas gift, or perhaps a violation of some sort of intra-familial equal-protection principle. His injury, then, depends entirely on what the underlying rules are and, accordingly, whether he has any cognizable rights.

As it is in life, so it is in the law. Because an injury occurs when a right is violated or diminished, in asking for Article III standing purposes whether a plaintiff has been injured, we necessarily—even if only implicitly—refer to some framework that establishes such rights. Happily, in determining whether an injury gives rise to an Article III "Case," we needn't appeal (substantive-due-process-style) to our own intuitions. The normative framework that determines whether someone has been injured in a legal sense—the baseline against which injury is measured—is the positive law. In other words, whether someone has suffered an "injury" depends on whether he has a cause of action: a "legal right" that has been violated, "for which the law provides a remedy." *Injury*, Black's Law Dictionary 905 (10th ed. 2014).

To underscore the point, I'll use a pair of legal examples. First, imagine a young woman who is seriously concerned about the federal deficit—she is so distraught, in fact, that every night she tosses and turns, unable to sleep. She decides to buy sleeping pills to help herself get some rest. After weeks of suffering, she sues to enjoin Congress from passing any additional economic-stimulus legislation. Next, imagine a young homeowner whose neighbor keeps a

pack of huskies in his backyard.  The dogs howl all night, every night.  Our

sleepless homeowner likewise buys medication to help himself get some rest.

After weeks of suffering, he sues his neighbor to abate the nuisance.  *See* Fletcher,

*supra*, at 231–32.  Most, I think, would intuitively conclude that the plaintiff in the

first example lacks "standing" but that the plaintiff in the second has it.  Me too,

but why?

  Under current standing doctrine, there seem to be three plausible

explanations.  First, one might posit that the deficit hawk's injury simply isn't

"concrete."  Her injury, the argument goes, is merely psychological—she just

disagrees with the government's fiscal policy, which isn't enough to confer

standing.  *See Valley Forge*, 454 U.S. at 485–86.  But that argument misses the

point:  While she does disagree with the government's fiscal policy, her alleged

*injuries* are physical (the loss of sleep) and monetary (the cost of the sleeping

pills).[12]

  Second, one might say that our deficit hawk's injury isn't "particularized":

Because stimulus spending affects everyone, she hasn't suffered any more (or

differently) than anyone else.  That argument, however, suffers from the same

---

[12] One might also contend that the injury is too attenuated, or seems implausible, but that
argument isn't about the *concreteness* of the injury; it's about the plaintiff's failure to sufficiently
allege (or prove) facts to confer standing.

basic defect.  The deficit hawk's injury isn't bad governance, but rather the specific

harms that she suffered as a result—the lost sleep and the purchased pills.

Third, one might concede that the deficit hawk has suffered an injury but

contend that her injury isn't fairly traceable to Congress's actions.  Because she

brought the injury on herself, so the argument goes—at least with respect to the

sleeping pills—she doesn't have standing to sue the federal government.  *See*

*Clapper*, 568 U.S. at 416 ("[R]espondents cannot manufacture standing merely by

inflicting harm on themselves based on their fears of hypothetical future harm that

is not certainly impending.").  But that argument proves too much, as it would also

foreclose our young homeowner's suit—he too bought sleeping pills (in response

to howling huskies) and so his monetary harms, at least, are also of his own

making.[13]

To explain our intuitions about the two cases, we needn't perform mental

gymnastics in an effort to discern whether the protagonists have suffered injuries

"in fact."  There's a much more straightforward account:  Our deficit hawk hasn't

suffered any violation of her legal rights, so she hasn't suffered any legally

---

[13] *Clapper*'s you-can't-injure-yourself rule follows from the injury-in-fact requirement.  If a plaintiff lacks an injury "in fact" despite a violation of his legal rights, then he must show some injurious *consequence* flowing from the violation of his legal rights.  So it's not surprising that plaintiffs manufacture injuries that courts have traditionally preferred—physical or monetary injuries.  *Cf. Lujan*, 504 U.S. at 592 (Blackmun, J., dissenting) (criticizing the Court for suggesting that the plaintiffs would have standing if they offered a "description of concrete plans" or specified their return visit date).

cognizable injury.  But our aggrieved homeowner's legal rights have been violated, and he has a remedy by which to vindicate them—a common-law cause of action to abate a private nuisance.  The question whether a plaintiff has "standing" really just boils down to the question of whether he has a cause of action—whether his legal rights have been infringed and whether the positive law authorizes him to sue for that infringement.  And as I've already explained, that is *exactly* the same conclusion that one would reach from the text of Article III and the early cases decided under it.  In asking a different question—and requiring something else—*Lujan* and *Spokeo* misstepped.

\* \* \*

None of this means, of course, that Congress can create any cause of action it wants—throwing open the courthouse doors to any plaintiff it wants—limited only by its imagination.  Statutory authorizations to sue may yet raise separation-of-powers concerns—notably, the very concerns that *Lujan* recognized.  But for reasons I will explain in Part II, those concerns find a more natural home in Article II of the Constitution than Article III.

### D

Before shifting gears to explain what might be called a theory of "Article II standing," let me briefly digress to make explicit one implication of what I've said so far:  If, as I maintain, a plaintiff's "standing" ultimately turns on whether she

has a cause of action, then it implicates the merits of her claim, *not* the court's power to entertain the case. To put the point more precisely, there is no *separate*, jurisdictional "standing" doctrine that limits a plaintiff's ability to sue.

At first blush, that might seem odd, or even preposterous—and certainly heretical. But it follows straightaway from my position that to have a "Case," a plaintiff must have, but need *only* have, a cause of action—*i.e.*, must be able to allege, then show, a violation of a legally cognizable right with a corresponding remedy.

In fact, in some of its decisions, the Supreme Court itself has recognized this relationship between the legal right at issue and injury-in-fact-style standing—and thereby (if unwittingly) lent credence to an early criticism of standing doctrine as "a poor disguise of the Court's view of the merits of the underlying claims," *Allen*, 468 U.S. at 782 (Brennan, J., dissenting). For instance, in *Lewis v. Casey*, 518 U.S. 343 (1996), the Court considered whether prisoners alleging violations of the constitutional right of access to the courts had suffered Article III injury. The inmates sought injunctive relief against various prisons, which had allegedly failed to provide adequate libraries and legal assistance. *Id.* at 346–47. The Court held that only those inmates who could demonstrate that "a nonfrivolous legal claim" regarding their confinement "had been frustrated or was being impeded" by the lack of access could show an Article III injury. *Id.* at 353. Why, though, weren't

the denial of library access and legal assistance themselves injuries "in fact"?  The
Court denied standing to the inmates who asserted injuries on those grounds
because, it said, they weren't legally cognizable—they didn't involve the violation
of a legal right.  *Id.* at 353 n.4, 355.  As a matter of substantive law, the Court
emphasized, the Constitution provides the right of access to *courts*, not law
libraries.  *Id.* at 360.  Accordingly, the Court held that only those inmates who had
demonstrated that the prison's failure to provide library access resulted in their
inability to pursue colorable legal claims had suffered injury sufficient to confer
standing.  But in so holding, the Court at least implicitly tethered the jurisdictional
injury-in-*fact* inquiry to the underlying claims' *legal* merits.

The point, of course, isn't that Supreme Court precedent supports viewing
standing as coterminous with the merits.  The Court has repeatedly rejected any
such equivalency.  *See, e.g.*, *Steel Co.*, 523 U.S. at 89; *Raines v. Byrd*, 521 U.S.
811, 818 (1997).  The point is that collapsing the two is hardly absurd, but rather
perfectly sensible.  Because, on my understanding, a "Case" exists if a plaintiff has
alleged a cause of action, whether a plaintiff has "standing" is necessarily bound
up in the merits.

* * *

Before moving on, then, let me summarize my thinking about Article III:
(1) the injury-in-fact-requirement lacks any real footing either in the Constitution's

text or in the history that led to its creation, and it has produced a doctrine that is incoherent in theory and easily manipulable in practice; (2) to the contrary, Article III's language, the common-law concepts that underlie it, and the Supreme Court's early interpretations of it show that a "Case" exists so long as a plaintiff has a cause of action—*i.e.*, a legal right and a remedy through which to enforce it; and (3) the question whether an Article III "Case" exists—as properly focused on whether the plaintiff has a cause of action—runs to the merits of the plaintiff's claim, rather than to the reviewing court's jurisdiction.

## II

From what I've said thus far, it should be clear that I think Congress has broad authority to create judicially enforceable rights by statute and thereby authorize private citizens to sue.  But Congress's authority isn't unlimited—it can't just enact any statute that it wants empowering private citizens to sue on any issue and for any remedy.  Standing doctrine has served to protect the separation of powers, and the current doctrine's textual, historical, and logical inadequacies don't eliminate those separation-of-powers concerns.  But, I submit, those concerns are grounded—and the relevant limits on congressional power are thus found—in Article II of the Constitution, not Article III.

In fact, the Supreme Court itself has suggested as much.  In *Lujan*, for instance—in many respects the cornerstone of modern Article III standing

doctrine—the Court recognized that the citizen-suit provision at issue there would, in effect, authorize private citizens to compel executive action and thereby "transfer from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed,' Art. II, § 3." 504 U.S. at 577. The dissenters understood the same point: "To prevent Congress from conferring standing for 'procedural injuries' is another way of saying that Congress may not delegate to the courts authority deemed 'executive' in nature." *Id.* at 604 (Blackmun, J., dissenting); *see also Allen*, 468 U.S. at 756–57 ("The Constitution . . . assigns to the Executive Branch, and not to the Judicial Branch, the duty to 'take Care that the Laws be faithfully executed.'").

*Lujan* was right to recognize that a statute empowering any person to sue over the executive branch's alleged failure to carry out its lawful duties would raise serious separation-of-powers concerns. But it was wrong that those concerns limited the *judiciary*'s power, rather than *Congress*'s power to confer on private plaintiffs the ability to perform what is, in effect, an executive function. Instead of asking the term "Case" in Article III to protect against intrusions on executive power, it seems to me more sensible to consider such challenges directly under Article II.

Let's explore, then, how Article II might constrain Congress's power to create causes of action—and thereby to confer "standing" on individual plaintiffs.

**A**

Article II of the Constitution explicitly "vest[s]" all federal "executive Power" in the President.  U.S. Const. art. II, § 1.  From that explicit vesting, it follows that the "executive Power" can't be exercised by private parties—including, as relevant here, private plaintiffs.  *See, e.g.*, *Martin v. Hunter's Lessee*, 14 U.S. 304, 329–30 (1816) (Story, J.) ("The second article declares that 'the executive power shall be vested in a president of the United States of America.' Could congress vest it in any other person; or, is it to await their good pleasure, whether it is to vest at all?  It is apparent that such a construction, in either case, would be utterly inadmissible.").  Although we recognize this constraint in theory—few would suggest, for instance, that Congress could outsource the criminal-prosecution power to the plaintiffs' bar—I worry that we have been inattentive to its implications in practice.  As I hope to show, the constraint imposed by Article II's Vesting Clause provides a sounder basis than Article III's case-or-controversy requirement for keeping improper legal actions out of the courts.

I start from the uncontroversial premise that certain kinds of lawsuits inherently involve the exercise of executive power.  Again, few would disagree, for example, that one who brings a criminal prosecution wields executive authority.  *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2200 (2020)

(observing that criminal prosecution is a "core executive power"); *Heckler v. Chaney*, 470 U.S. 821, 832 (1985); *Buckley v. Valeo*, 424 U.S. 1, 138 (1976).  For this reason, the Supreme Court has recognized that the President and his subordinates—rather than private parties—have the "exclusive authority and absolute discretion to decide whether to prosecute" criminal actions.  *United States v. Nixon*, 418 U.S. 683, 693 (1974).

But *why* is a criminal prosecution executive in nature?  What explains the conceptual dichotomy between suits that are inherently executive in nature and those that aren't?  So far as I can tell, the explanation begins with the recognition that a violation of the law can give rise to two different kinds of legal actions.  First, the individual victim of a legal violation may be able to initiate a suit seeking a remedy that will accrue to him personally, such as a monetary award in his name.  Second, and separately, an entity acting on behalf of the larger community may be able to bring an action seeking a remedy that accrues to the public, such as imprisonment or a fine to be paid into the treasury.  *See* Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 696 (2004) (explaining that a violation of the law has long been understood to "potentially g[i]ve rise to two separate kinds of actions," (1) "the individual victim's tort action for compensation" and (2) "the public's criminal action for punishment").

This distinction can be traced back at least to Locke. *See* John Locke, Two Treatises of Government 124–26 (Thomas L. Cook ed. 1947) (1689). He described the first kind of action as a "particular right to seek reparation," belonging "only to the injured party," and the second as the "common right" to "punish the transgressors of [the] law," belonging to the community at large. *Id.* Later, but in the same vein, Blackstone divided the third and fourth volumes of his Commentaries into "private wrongs" and "public wrongs." A private wrong, he explained, involved "an infringement or privation of the private or civil rights belonging to individuals, considered as individuals," whereas a public wrong involved "a breach and violation of public rights and duties, which affect the whole community, considered as a community." 3 Blackstone, Commentaries *2. A single violation often involved both kinds of wrongs, and thus could give rise to two kinds of legal actions: private wrongs to suits seeking to "redress the party injured," and public wrongs to suits seeking to "secure to the public the benefits of society." 4 Blackstone, Commentaries *5–7. By way of illustration, Blackstone explained that when a perpetrator batters someone, "the party beaten may . . . have his private remedy by action of trespass for the injury, which he in particular sustains, and recover a civil satisfaction in damages," and the perpetrator "may be indicted for [battery] at the suit of the king, for disturbing the public peace, and be punished criminally by fine and imprisonment." *Id.* at *6.

Conspicuously, Blackstone described this second kind of action—"the right of punishing crimes"—as the power to "put [the laws] in *execution*."  4 Blackstone, Commentaries *7–8 (emphasis added).  Locke similarly—and consistently— described the second kind of action as synonymous with "the executive power." *See* Locke, *supra* at 127, 157–58, 164, 165, 186.  Rounding out the triad, Montesquieu—probably the only thinker whose influence on the Framers rivaled Locke's and Blackstone's—likewise described the power by which the sovereign "punishes criminals" as "the executive power."  Baron De Montesquieu, The Spirit of the Laws 69 (Frank Neuman ed. 1952) (1748).  Thus, at its core, the "executive power" entailed the authority to bring legal actions on behalf of the community for remedies that accrued to the public generally.  *See* Saikrishna Prakash, *The Essential Meaning of Executive Power*, 2003 U. Ill. L. Rev. 701, 743–52 (2003).

As the story goes, an individual in a pre-political state could bring both kinds of actions, but when he entered into civil society, he "resign[ed]" his "executive power" to his agents in government.  Locke, *supra*, at 164.  As Chief Justice Roberts has explained, "[a] basic step of organizing a civilized society" is to take the "sword" of law-enforcement actions "out of private hands and turn it over to an organized government, acting on behalf of all the people."  *Robertson v. U.S. ex rel. Watson*, 560 U.S. 272, 282–83 (2010) (Roberts, C.J., dissenting from the dismissal of a writ of certiorari).  Accordingly, Blackstone explained that in

England, the king alone, as the representative of the community and wielder of the
"executive power," was the "proper prosecutor for every public offense."  4
Blackstone, Commentaries *2.  Once the people have established a political
society, only the sovereign can bring legal actions on behalf of the community for
remedies that accrue to the public.  It enjoys the *exclusive* executive power.

Right on script, the American Founders, in creating our new national
government, vested the "executive Power" not in private parties but rather in a
public official—the President.  U.S. Const. art. II, § 1.  In doing so, they both
reflected and expressed the by-then-familiar proposition that a polity's chief
executive would have the exclusive authority to, among other things, institute legal
actions on behalf of the community for remedies that accrue to the public.  As one
commentator explained at the time, the new Constitution's President would be the
"avenger of public wrongs."  A Farmer, II, Balt. Md. Gazette, Feb. 29, 1788,
*reprinted in* 11 Documentary History of the Ratification of the Constitution 325,
330 (John P. Kaminski et al. eds., 2015).

But even as an individual entering political society ceded his "executive
Power" to bring actions on behalf of the general public, he retained the authority to
bring suit in his personal capacity as a victim to obtain remedies that accrue to him
individually, such as a monetary award in his name.  *See* Locke, *supra*, at 124–27.
As John Marshall explained, "a private suit instituted by an individual, asserting

his claim to property, can only be controlled by that individual"—unlike a public

prosecution, "[t]he executive can give no direction concerning it."  Representative

John Marshall, Speech Delivered in the House of Representatives of the United

States, on the Resolutions of the Hon. Edward Livingston (March 7, 1800).  Ever

since, America has enjoyed an unbroken history of private citizens bringing private

actions to vindicate their private rights, free from presidential control or

interference.

The conceptual dichotomy between actions of a personal nature and those of

an executive nature better explains historical practice, already canvassed, than

current Article III standing doctrine.  Throughout American history, courts have

regularly allowed suits to proceed whenever the plaintiff was vindicating a

personal legal right and sought a remedy that accrued to him personally, even if he

couldn't prove a tangible "injury in fact."  *See supra* at 29–34; *Muransky*, 979 F.3d

at 970–73 (Jordan, J., dissenting) (collecting cases).  By contrast, courts have

required the government to bring actions—most notably, criminal prosecutions—

that alleged injuries to generalized, shared interests and that sought remedies

accruing to the public.  *See supra* at 34; Hartnett, *supra*, at 2239.  So, for instance,

courts haven't allowed private plaintiffs to sue to vindicate any other than their

own personal interests as injured parties.  *See Railroad Co. v. Ellerman*, 105 U.S.

166, 174 (1881) (holding that a suit can't be maintained where a private plaintiff

"alleges that the [defendant] is acting beyond the warrant of the law" but not that

the defendant's violation "itself injuriously affect[s] any of [the plaintiff's]

rights"); Woolhandler & Nelson, *supra*, at 702 n.59 (collecting cases). And other

than the idiosyncratic and unchallenged instance of *qui tam* actions, courts haven't

allowed private plaintiffs to sue for remedies that accrue to the public as a whole.

*See Confiscation Cases*, 74 U.S. 454, 457 (1868) (recognizing the "[s]ettled rule"

that no actions could proceed for the "benefit" of the federal government except at

the behest and under the direction of the government); *Sparhawk v. Union Pass.*

*Ry. Co.*, 54 Pa. 401, 422 (1867) ("[W]hen [injunctive] remedy is sought by a

private party it is only for the redress of a private injury, excepting when

incidentally it may go further and redress one against the public.").[14]

---

[14] To be sure, the existence of *qui tam* actions offers some counterevidence against a strict
demarcation of private and public actions, based in Article II, just as it is one of several reasons
to doubt that Article III requires every plaintiff to demonstrate a concrete injury in fact. *See*
*supra* at 32–33. After all, if the executive power was vested in the President, then how could
Congress authorize a private plaintiff to sue for a violation of law that causes him no individual
harm and to seek a monetary penalty that he would share with the government? One possible
explanation is that these actions didn't raise Article II problems because the executive branch
retained full control over them. *See* Harold J. Krent, *Executive Control Over Criminal Law*
*Enforcement: Some Lessons From History*, 38 Am. U. L. Rev. 275, 292–93, 296 (1989)
(explaining that the Judiciary Act of 1789 "implicitly vested the district attorneys with exclusive
authority to prosecute all federal crimes within their jurisdiction" and that while private citizens
could initiate prosecutions under early *qui tam* statutes, the district attorney retained control over
them and could terminate the prosecutions at will). In any event, the *qui tam* challenge is less
insuperable for an Article II theory than an Article III theory. Because the former runs to the
merits, a court needn't decide whether *qui tam* actions violate Article II unless the issue is
presented. *See Vermont Agency*, 529 U.S. at 778 n.8 (acknowledging but declining to address
potential Article II problem with *qui tam* action because the defendant hadn't raised it).

I would adhere to this dichotomy—which, to me, suggests that the primary limit on the kinds of actions that Congress can authorize in the federal courts comes from Article II's Vesting Clause, not Article III's case-or-controversy requirement.  Under this view, Congress has broad authority to grant a private plaintiff a cause of action, so long as it empowers him only to vindicate his own rights and to seek remedies that will accrue to him personally.  But Congress may not give to anyone but the President and his subordinates a right to sue on behalf of the community and seek a remedy that accrues to the public—paradigmatically (but by no means exclusively) criminal punishment or a fine.  Were Congress to confer on a private plaintiff the power to bring that kind of action, it would unlawfully authorize him to exercise Article II "executive Power."  *Cf. Seila Law*, 140 S. Ct. at 2191–92 (holding that because "the executive power—all of it—is vested in a President," he must be able to "remove—and thus to supervise—those who wield executive power" (quotation marks omitted)).

The way I now see things, therefore, Congress can create causes of action, for instance, authorizing a private plaintiff to vindicate his personal rights against the publication of his credit-card numbers, *contra Muransky*, 979 F.3d at 929–31, against the mailing of misleading debt-collection letters, *contra Trichell*, 964 F.3d at 998, against the preparation of inaccurate credit reports, *cf. Spokeo*, 136 S. Ct. at 1550, or, as here, to vindicate his personal right to an accommodation of his

disability, *see* 42 U.S.C. § 12132.   What Congress can't do is create a cause of

action authorizing an individual plaintiff to sue for harm done to society generally.

So, to use the facts of this case, Congress can authorize Eddie Sierra to sue the City

of Hallandale Beach for failing to accommodate *him*, as the ADA requires.  *See id.*

("[N]o qualified individual with a disability shall, by reason of such disability,

. . . be denied the benefits of the services, programs, or activities of a public entity

. . . .").  But it couldn't authorize him to sue the City for failing to accommodate

those with disabilities more generally.  Nor can Congress create a private cause of

action authorizing an individual to pursue remedies that accrue to the public

generally rather than to him personally.  So it can authorize Sierra to sue for

damages, as it has here.  *See* 42 U.S.C. § 12133; 29 U.S.C. § 794a(a)(2); *Barnes v.*

*Gorman*, 536 U.S. 181, 184–85 (2002).  But it couldn't authorize him to sue for a

fine to be paid into the public treasury.  Were Congress to authorize Sierra to sue

for *any* violation of the law, or for remedies that don't accrue to him personally, it

would unlawfully empower him to exercise the "executive Power."

        To be clear, accepting my thesis here doesn't demand adherence to any

particular theory of Article II—either with respect to the meaning and scope of the

"executive Power" vested in the President or with respect to the President's control

over the subordinates who exercise that power.  Although vigorous disagreement

persists, for instance, about the extent of "executive Power," few deny that the

Vesting Clause grants the President and his subordinates the exclusive authority to bring criminal prosecutions as a means of executing the laws. *See* Curtis A. Bradley & Martin S. Flaherty, *Executive Power Essentialism and Foreign Affairs*, 102 Mich. L. Rev. 545, 546–47, 661, 664 (2004). Likewise, although it's hotly contested whether the Vesting Clause grants the President absolute control and removal authority over anyone exercising executive power, few contend that core executive powers, such as criminal prosecutions, can be placed in the hands of civilians who are entirely independent of any governmental supervision. *See, e.g.*, *Morrison v. Olson*, 487 U.S. 654, 691–92 (1988); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 515–16 (2010) (Breyer, J., dissenting).

*   *   *

Taking stock:  When the Court in *Lujan* established injury in fact as part of the "irreducible constitutional minimum" necessary to have a "Case" within the meaning of Article III, it did so, at least in part, to address the serious separation-of-powers concerns that the Endangered Species Act's citizen-suit provision presented.  In my view, though, Article III has proven ill-suited to address those concerns.  Article II's vesting of "executive Power" in the President, on the other hand, straightforwardly explains the result in *Lujan*—a case in which the plaintiffs sought to challenge broad-based government policies that they claimed had far-reaching injurious effects, and sought a remedy accruing not to them individually,

but rather to society at large.  As the Framing-era evidence shows, actions like those in *Lujan* would have been widely understood to be "executive" in nature.

## B

This Article II approach to "standing" isn't as radical as at first it may appear.  Prohibiting Congress from vesting the "executive Power" in private plaintiffs somewhat resembles current standing doctrine's requirement that a plaintiff seek to vindicate a "particularized" injury by resort to a remedy that "redresses" it.  For instance, in one formulation of "particularity" and "redressability," the Supreme Court has said that "[t]o have standing, a litigant must seek relief for an injury that affects him in a 'personal and individual way.'" *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013).  Elsewhere, the Court has said that civil penalties "payable to the United States Treasury" rather than to a plaintiff individually, would not remedy the plaintiff's own injury but rather would "vindicat[e] the rule of law," which did "not suffice" for standing.  *Steel Co.*, 523 U.S. at 106.  These descriptions of the "particularity" and "redressability" requirements mirror the Lockean-Blackstonian explanations of personal, *non*-executive suits as requiring some individualized injury and remedy.  *See* Locke, *supra*, at 125–126; 3 Blackstone, Commentaries *2.

Again, though, to the extent that Article III doctrine gets things right, I think it's more coincidental than the result of correctly applying a unifying principle.

For that reason, standing precedents can at times seem a little haphazard. For

instance, if the particularity and redressability requirements derive from Article III,

then they must apply to all lawsuits and litigants. But courts have never applied

them meaningfully to suits brought by the President and his subordinates—which,

of course, reliance on Article II's Vesting Clause readily explains. *See, e.g.*,

*United States v. Borden Co.*, 347 U.S. 514, 518 (1954) ("The Government seeks its

injunctive remedies on behalf of the general public[.]").

And while there are some similarities, there are also important differences.

First, as just noted, because the Supreme Court derives the particularity and

redressability requirements from Article III, courts theoretically must apply them

in all "Cases," and they must do so *sua sponte*. Neither is true under Article II.

Needless to say, Article II's Vesting Clause would pose no bar in federal criminal

prosecutions, and where Article II's limits applied the defendant would presumably

bear the burden of asserting (or waiving) them.

Second, the Article II limitations that I've identified—that a private plaintiff

must allege a violation of his own legal rights and seek a remedy that accrues to

him personally—would apply based on the source of the cause of action, rather

than, as with Article III requirements, the court in which the plaintiff sues.

Accordingly, these Article II limitations would apply to all actions arising under

federal law regardless of whether they were brought in federal or state court. That

makes good sense to me.  After all, it couldn't possibly be that the result in *Lujan* should have been different had the plaintiffs there filed their action in a state court without an Article-III-equivalent standing doctrine.  And by the same token, a plaintiff suing on a state-law cause of action—even in federal court—wouldn't risk usurping the federal "executive Power."

Finally, shifting the focus from Article III to Article II may yield practical benefits.  For instance, to the extent that particularity and redressability map onto the Lockean-Blackstonian account of personal, non-executive actions, I suspect that grounding those requirements in the wrong constitutional text has contributed to some distorted results.  *See*, *e.g.*, *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185–88 (2000) (holding that penalties payable to the treasury redressed the plaintiff's private injury because those penalties would deter the conduct that harmed the plaintiff); *id.* at 209 (Scalia, J., dissenting) ("By permitting citizens to pursue civil penalties payable to the Federal Treasury, the Act does not provide a mechanism for individual relief in any traditional sense, but turns over to private citizens the function of enforcing the law.").  By asking whether a suit improperly exercises the "executive Power" within the meaning of Article II, we better understand where these requirements come from, and thus will be less likely to go astray.

My approach also resembles the rights-based approach advanced by Justice Thomas and others, including my colleague Judge Jordan. *See Spokeo*, 136 S. Ct. at 1550–52 (Thomas, J., concurring); *Muransky*, 979 F.3d at 970–73 (Jordan, J., dissenting); *Springer v. Cleveland Clinic Employee Health Plan Total Care*, 900 F.3d 288, 290–91 (6th Cir. 2018) (Thapar, J., concurring); *cf. Bryant v. Compass Group USA, Inc.*, 958 F.3d 617, 624 (7th Cir. 2020) (Wood, C.J.). Like me, these jurists have questioned the historical basis for the injury-in-fact requirement. They have proposed instead an Article III standing doctrine that distinguishes between "private" and "public" rights. Relying on Blackstone's account, as I do here, they say that "private rights," are those "belonging to individuals, considered as individuals." *Spokeo*, 136 S. Ct. at 1551 (Thomas, J., concurring) (quoting 3 Blackstone, Commentaries *2). "Public rights," by contrast, are those "owed 'to the whole community, considered as a community, in its social aggregate capacity.'" *Id.* (quoting 4 Blackstone, Commentaries *5). A private plaintiff can sue for violations of his own private rights, but not for pure violations of public rights. *Id.* at 1553.

My reservation about the rights-based framework has been its constitutional source. To the extent that it came from the word "Case," I've struggled to reconcile it with the available evidence of that term's meaning, *see supra* at 25–29, and universally accepted historical examples of the kinds of "Cases" that English

and early American courts routinely entertained, *see supra* at 29–34.  I've also

been unsure how to draw the line between "public" and "private" rights, in part

because those terms seem to mean different things at different times and in

different areas of the law.  *Compare, e.g., Stern v. Marshall*, 564 U.S. 462, 493

(2011) (describing "public rights" as involving "matter[s] that can be pursued only

by grace of the other branches," such as claims seeking personal compensation

from the government), *with, e.g.*, *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1623

(2020) (Thomas, J., concurring) (defining "public rights" as those "owed to the

community, considered as a community, in its social aggregate capacity").

But upon closer examination, I think that the rights-based approach moves in

the right direction—except, I say, that its proper foundation is in Article II, not

Article III.  As I now understand it, an action to vindicate a "public right"

corresponds to the kind of legal action that I've described as inherently

"executive."  It's no surprise, then, that Justice Thomas and Judge Jordan have

explained that their framework serves interests related to the vesting of executive

power in the President.  *See Spokeo*, 136 S. Ct. at 1552–53 (Thomas, J.,

concurring); *Muransky*, 979 F.3d 917, 978 (Jordan, J., dissenting).

One last thing:  I readily confess that re-conceptualizing "standing" in

Article II terms is not a panacea, and it raises its own set of hard questions.  It's

perhaps no more self-evident where proper individual enforcement leaves off and

the "executive Power" begins than it is where "particularized" harms (or "private rights") leave off and "generalized" grievances (or "public rights") begin.  Even so, to my mind, there is significant value in shifting our focus from Article III to Article II.  As one commentator has said in a related context, "[c]larity of understanding is gained when organizing concepts are sorted out coherently."  Henry Monaghan, *Third Party Standing*, 84 Colum. L. Rev. 277, 301 (1984).  Article II's Vesting Clause provides a firmer textual, historical, and conceptual ground than Article III's case-or-controversy requirement for thinking about legal constraints on the kinds of actions that Congress can direct through the federal courts.  By turning our attention to Article II, it seems to me that at least we'll be seeking answers in the right place.

### III

To sum up:  Taken together, the concerns underlying current standing doctrine can be reformulated in two related principles.  First, an Article III "Case" exists if, and whenever, the plaintiff has a cause of action—including under any statutory provision authorizing suit in federal court to vindicate the violation of a legal right.  But second, even if Congress has given the plaintiff a cause of action, the defendant may nonetheless show that Congress's creation violates Article II's vesting of the "executive Power" in the President and his subordinates.

Applying that framework here, Congress has created a cause of action—both a right and a remedy—against discrimination under Title II of the ADA and Section 504 of the Rehabilitation Act.  Eddie Sierra has sufficiently shown a violation to survive summary judgment.  And the City of Hallandale Beach has (of course, unsurprisingly) not challenged Congress's authorization as a violation of Article II.

Under existing standing doctrine, I join the Court in holding that Sierra has suffered an injury in fact.  But I also join a growing chorus of jurists and scholars who have questioned that doctrine and suggested that we need a course correction. I, for one, hope that that correction comes sooner rather than later.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

May 06, 2021

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  19-13694-HH
Case Style:  Eddie Sierra v. City of Hallandale Beach
District Court Docket No:  1:17-cv-24045-FAM

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing, are available at www.ca11.uscourts.gov.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against appellee.

Please use the most recent version of the Bill of Costs form available on the court's website at
www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number
referenced in the signature block below. For all other questions, please call Christopher
Bergquist, HH at 404-335-6169.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No.  19-13694

ERRATA

_____

MR. EDDIE I. SIERRA,

Plaintiff - Appellant,

versus

CITY OF HALLANDALE BEACH, FLORIDA,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

The opinion has been changed as follows:

> On page 14, the citation for *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.* has been updated from the Westlaw citation to the citation to the official reporter: "994 F.3d 1341, 1345–49 (11th Cir. 2021)."

> On page 16, the phrase "for judicial review *by* any person" has been changed to "for judicial review *for* any person."

> On page 17, "*Id.* at 151–52" has been changed to "*Data Processing*, 390 U.S. at 151–52."

On page 22, the phrase "which Congress *can't* lower by statute" has been changed to "which Congress *couldn't* lower by statute."

On page 24, footnote 3, the words "compare" and "with" in the sentence that begins "And with respect to the third" have been unitalicized.

On page 38, the citation "*In re Winship*, 397 U.S. at 381–82 (collecting cases" has been changed to "*In re Winship*, 397 U.S. at 381–82 (Black J., dissenting) (collecting cases)."

On page 54, a "*supra*" has been inserted: "*See* Locke, *supra* at 127, 157–58, 164, 165, 186."

On page 60, a stray "c" has been deleted, from "*Pub.c*" to "*Pub.*"